UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| UNITED STATES OF AMERICA, | CASE NO. CR12-47 MJP |
|---|---|
| Plaintiff, | FINDINGS OF FACT AND CONCLUSIONS OF LAW AND ORDER GRANTING IN PART DEFENDANT'S MOTION FOR SUPPRESSION OF EVIDENCE AND STATEMENTS |
| v. | |
| HERMINIO SILVA, | |
| Defendant. | |

This matter comes before the Court on Defendant Herminio Silva's motions to suppress post-arrest statements and evidence seized pursuant to the warrantless search of his home. (Dkt. Nos. 586, 709.) The Court reviewed the motions, the government's responses (Dkt. Nos. 610, 720, 770, 779), Defendant's reply (Dkt. No. 771), all related papers and conducted evidentiary hearings on December 7, 17, and 18, 2012 and January 15, 2013, at which time it heard testimony from DEA Special Agent Lori Miller, DEA General Supervisor David Escobar, DEA Special Agent Shawn Riley, DEA Special Agent Brent Coup, MADNet Detective Greg Rodriguez, Filomena Prudente, and the Defendant Herminio Silva. Having reviewed all of these

FINDINGS OF FACT AND CONCLUSIONS OF
LAW AND ORDER GRANTING IN PART
DEFENDANT'S MOTION FOR SUPPRESSION
OF EVIDENCE AND STATEMENTS- 1

materials, the Court GRANTS, in part, the motions to suppress and ORDERS the Silva's statements made at his residence and the cell phone suppressed.

**Findings of Fact**

1. On March 23, 2012, an arrest warrant issued for the Defendant, Herminio Silva. After a multi-year investigation, the Drug Enforcement Agency ("DEA") believed Silva was part of a large-scale drug trafficking organization ("DTO") in the Seattle area referred to as the Juarez-Santos DTO.

2. In addition to the arrest warrants, that same day, 22 search warrants issued. No search warrant was sought for Silva's home in Chowchilla, California.

3. Before his arrest, Silva was a resident of California. He is a citizen of Mexico.

4. During the multi-year investigation, DEA investigators obtained numerous warrants to track cellular telephones and intercept communications over those phones. DEA investigators identified Silva as the user of a phone termed TT46, which had been tracked using GPS to a house in Madera, California.

5. On January 15, 2012, TT46 was seized during a traffic stop of Silva's vehicle in Lacey, Washington. Tracking on that phone ceased and investigators no longer knew Silva's whereabouts.

6. On February 13, 2012, DEA agents obtained a tracking warrant for a cell phone agents believed was tied to Silva. That phone is referred to as TT54. The phone was subscribed to an individual named Joel Silva.

7. On February 14, 2012, DEA agents began receiving GPS information for TT54. GPS tracking information showed TT54 regularly pinged from a rural address in Chowchilla, California.

8. After attempting surveillance, government agents were unable to determine who lived at the Chowchilla, California address.

9. The case administrator for the Juarez-Santos DTO investigation decided the arrest warrant issued for Silva on March 23, 2012 should be executed on the Chowchilla home. The DEA was not certain Silva would be at this address.

10. On the morning of March 28, 2012, agents from the DEA, the US Marshals Office, and the Madera County Narcotic Enforcement Team (MADNET) met for a briefing on two arrest warrants related to a simultaneous take-down of the Juarez-Santos DTO. The officers had arrest warrants for Eduardo Herrera Gonzalez and Silva. DEA General Supervisor David Escobar directed officers to get the cell phone (TT54) during the arrest of Silva.

11. One law enforcement officer who participated in the arrest of Silva, MADNET Detective Greg Rodriguez is certified as bilingual in Spanish and English by the California Highway Patrol. Although he was present at the arrest of Silva, Detective Rodriguez's language skills were not utilized to explain basic rights, provide Miranda warnings, or participate in Silva's interrogation. Instead of using a certified officer on the scene of the arrest, Agent Escobar led during entry of the home and execution of the arrest warrant.

12. The Court had an opportunity to observe Agent Escobar's Spanish proficiency. Agent Escobar is not fluent in Spanish and is unable to communicate complex ideas or words. Agent Escobar testified that to communicate with Spanish speakers he must rely on their English language abilities.

13. At approximately 6:00 a.m. on March 28, 2012, agents attempted to arrest Gonzalez, but did not find him home.

14. Seventeen law enforcement officers went to the Chowchilla, California home to effectuate the arrest warrant of Mr. Silva.

15. At approximately 6:30 a.m., Agent Escobar knocked on the door of the Chowchilla home. In both English and Spanish he yelled "Police."

16. Filomena Prudente, Silva's wife, opened the door.[1] Ms. Prudente is native Spanish speaker who attended school through the fifth grade. She is able to write her name in Spanish but is otherwise illiterate. Ms. Prudente does not speak or write in English.

17. An agent patted Ms. Prudente down in an apparent check for weapons. Without first obtaining her consent, Agent Escobar followed by DEA Special Agent Shawn Riley entered the house.

18. Standing inside the entryway, Agent Escobar showed Ms. Prudente a picture of Silva. In Spanish he asked where Silva was. In response, Ms. Prudente stated he was down the hall in a bedroom.

19. Almost simultaneously, Silva emerged from a room next to the hallway. He was wearing only his underwear.

20. Several agents then followed and performed a protective sweep of the home. Their weapons were drawn and were pointed at 45 degrees, in a "low ready" stance. The small residence is a single story with three bedrooms, a bathroom, kitchen and living room and an entry. Officers quickly performed the sweep and secured the residence.

---

[1] Although Mr. Silva and Ms. Prudente are not legally married, they refer to each other as "husband" and "wife." The Court therefore uses these terms too.

21. During the sweep, officers found the couple's children in one of the bedrooms. The children, then ages 4, 5, and 9, were crying and asking for their parents. A law enforcement agent entered the room with the children and shut the door.

22. In Spanish, Agent Escobar informed Silva that he was under arrest and immediately placed him in handcuffs. Agent Escobar did not, however, give <u>Miranda</u> warnings.

23. Agent Escobar then asked both Silva and Ms. Prudente in Spanish if there were "guns, drugs, or money" in the home. Both said no.

24. Agent Escobar then asked if Silva had a cell phone in the house. Silva confirmed that he had a phone in the bedroom.

25. Government agents knew TT54 was inside the Chowchilla home because the GPS tracker on the phone was still activated.

26. Agent Escobar led Silva to the bedroom. There were two phones on an ironing board next to the bed. Agent Escobar asked Silva "Is this your phone?" Silva identified which phone was his.

27. Detective Dorr of MADNET took the phone and charger. Agent Riley then took possession of the phone and wall charger. He called Agent Miller in Seattle to report locating and obtaining TT54. Agent Riley read Agent Miller telephone numbers in TT54's address book. Agent Riley later shipped it to Seattle and it was taken into evidence.

28. Seattle DEA agents performed a forensic examination of TT54. No warrant was ever sought or obtained to search the contents of TT54.

29. Silva was permitted to dress. Silva did not keep his clothing in the master bedroom. Rather, it was kept in a third bedroom, which was closest to the entry where Silva had first been placed under arrest.

30. Agent Escobar escorted him outside the residence to a DEA car. Silva was placed in the vehicle. Agent Escobar then asked Silva if he knew the whereabouts of Gonzalez. Silva had still not been appraised of his <u>Miranda</u> rights.

31. Silva denied knowing Gonzalez or his whereabouts.

32. After Silva had been questioned, Agent Riley obtained from his car a consent to search form in Spanish. It was not presented to Silva. Instead, he gave it to Agent Brent Coup with the directive to get Ms. Prudente's consent to search the house.

33. Agent Coup presented the form to Ms. Prudente, who had been detained in a bedroom with her three young children. He marked an "X" where she should sign. Agent Riley learned from the couple's 9-year old child that Ms. Prudente had a limited grade school education and could not read in English or Spanish.

34. No one testified that the form was read, explained, or that Ms. Prudente understood the form.

35. Without advisement of her right to refuse the search or limit the scope of the search, Ms. Prudente signed the form where the x was marked.

36. Agent Coup dated the form and signed as a witness. Agent Riley also signed as a witness.

37. Law enforcement then conducted a search of Silva and Ms. Prudente's residence. They found nothing of evidentiary value.

38. Agents Escobar and Riley drove Silva to the DEA office in Fresno, California, where he was interviewed.

39. Agent Escobar read from his DEA 13A card, which contains Miranda rights. One side of the card contains rights in English, the other side in Spanish. Agent Escobar only read the Spanish side to Silva. It contained four Miranda warnings.

40. After each of the four Miranda warnings, Agent Escobar asked if Silva understood the right and whether he was willing to waive it. After each, Silva said "Yes."

41. Although the DEA has written Miranda warnings in Spanish, Agent Escobar did not use the form.

42. Defendant Silva informed Agent Escobar that he was a Mexican national. Despite this knowledge, Agent Escobar did not advise Silva of his right to contact the Mexican consulate under the Vienna Convention.

43. In Court Silva testified to understanding the Miranda warnings and voluntarily choosing to answer Agent Escobar's questions.

44. Agent Escobar then conducted a several minute interview with Silva. The interview was not electronically recorded. Agent Escobar asked Silva if he had delivered narcotics to Washington. Silva denied doing so. Silva did admit to having traveled to Lynwood, Washington twice in the prior year. Escobar showed a photo of Gonzalez and asked if Silva knew him. Silva admitted that he recognized Gonzales, but stated he had last seen Gonzalez more than two months before. Silva was not given an opportunity to provide a written statement.

//

//

**Conclusions of Law**

Defendant argues his statements to law enforcement on March 28, 2012 following his arrest as well as the evidence seized, the cell phone, should be suppressed. The Court agrees in part and suppresses all of Silva's statements made at the residence and the cell phone, TT54 located during a search of the residence.

A. <u>Statements</u>

The Supreme Court in <u>Miranda v Arizona</u> concluded the accused must be appraised of his rights and law enforcement must respect those rights. <u>Miranda</u>, 429 U.S. 492 (1977). If the accused waives these rights, the waiver must be voluntary, knowing, and intelligent. <u>Id.</u> The government carries the burden of proving the voluntariness of a defendant's statement. <u>Colorado v. Connelly</u>, 479 U.S. 157, 168 (1986). For a confession or statement to be voluntary, it must be both the product of free will and must be given with full awareness of the nature of the right being abandoned and the consequences of the decision to abandon it. <u>Moran v. Burbine</u>, 475 U.S. 412, 421 (1986). In assessing the validity of the waiver, courts analyze the totality of the circumstances. <u>Id.</u>

1. <u>Statements at the Residence</u>

Here, Silva did not and could not knowingly, voluntarily and intelligently waive his right to be silent when questioned at his home because he was never advised of this right. The facts surrounding Silva's interrogation at his home show Agent Escobar asked questions designed to incriminate (the presence of contraband inside the home as well as a cell phone believed to be used in drug trafficking) without taking any step to ensure Silva knew of his rights and had voluntary waived them. The government concedes that in the absence of <u>Miranda</u> and without

any evidence of the voluntariness of the statements, they cannot be used in its case-in-chief against Mr. Silva. Consequently, the Court orders the statements suppressed.

The Court disagrees with the government's argument that a portion of the statements are admissible because they fall within the public safety exception to <u>Miranda</u>. In <u>New York v. Quarles</u>, 467 U.S. 649, 656 (1984), the Court concluded emergency circumstances may justify not giving <u>Miranda</u> warnings where "a threat to public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege from self incrimination." <u>Id.</u> at 657-58. In applying the exception, a court asks whether there was an "objectively reasonable need to protect the police from any immediate danger." <u>Id.</u> at 659.

The government contends the need to know the whereabouts of Gonzalez justified the questioning of Silva without first providing <u>Miranda</u> warnings because of the "time sensitive need" to effectuate the arrest warrant. (Dkt. No. 720 at 14.) The Court finds this argument a misapplication of the public safety exception. The government's interest in a simultaneous take-down of an alleged drug conspiracy is simply not an emergency in which law enforcement could trammel Silva's constitutionally protected rights. Even if the public has an interest in timely effectuation of arrest warrants, there was no immediate danger to the public if Gonzalez was not arrested. The government has failed to meet its burden of establishing any objective and reasonable need to question Silva without apprising him of his rights under <u>Miranda</u>.

2. <u>Statements at DEA Station</u>

Silva also argues his post-Mirandized statements made at the DEA station should be suppressed. First, he contends the statements were the product of a two-step interrogation strategy prohibited by <u>Missouri v. Seibert</u>, 542 U.S. 600 (2004) and <u>United States v. Williams</u>, 435 F.3d 1148 (9th Cir. 2006). Second, he attacks the voluntariness of the statements, arguing

the government agents failed to apprise him of his right to contact the Mexican consulate. As to both arguments, the Court denies the motion to suppress.

"A two-step interrogation involves eliciting an unwarned confession, administering the Miranda warnings and obtaining a waiver of Miranda rights, and then eliciting a repeated confession." United States v. Narvaez–Gomez, 489 F.3d 970, 973–74 (9th Cir. 2007). The Court must engage in a two-step inquiry in deciding whether the defendant's post-Miranda statements should be suppressed. Id. at 974. First, the Court must determine whether the interrogators' failure to provide the defendant with the Miranda warnings was deliberate. Seibert, 542 U.S. at 622; see also Williams, 435 F.3d at 1157–58 (Justice Kennedy's concurrence in Seibert is the Court's holding because it is narrowest grounds with which majority of the Court would agree). "[I]f the two-step method is not deliberate, the post-warning statements are admissible if voluntarily made." Narvaez–Gomez, 489 F.3d at 974. Second, if the two-step strategy was deliberately employed, "the district court must suppress post—warning statements unless the interrogators take curative measures to apprise the defendant of his rights." Id.

In this case, the Court finds the two-step interrogation was not deliberately used. The Ninth Circuit indicated that "in determining whether the interrogator deliberately withheld the Miranda warning, courts should consider whether objective evidence and any available subjective evidence, such as an officer's testimony, support an inference that the two-step interrogation procedure was used to undermine the Miranda warning." Williams, 435 F.3d at 1158. Objective evidence "would include the timing, setting and completeness of the prewarning interrogation, the continuity of police personnel and the overlapping content of the pre- and postwarning statements." Id. at 1159.

1       Here, Silva was asked if he had guns, drugs, money or a cell phone. While these
2 statements were incriminating in nature, they were aimed at obtaining physical evidence, not
3 securing a confession. The questioning at the Silva residence was quick in duration, consisting
4 of approximately 5 questions and lasting not more than a few minutes. Unlike the questioning at
5 issue in Seibert, it was not a full interrogation aimed at securing incriminating evidence of
6 Silva's participation in the DTO. In contrast, at the DEA office, after providing Miranda
7 warnings, Agent Escobar questioned Silva about his alleged role in the Juarez-Santos DTO, his
8 travels to Washington, whether he supplied drugs to those in Washington, and whether he knew
9 Gonzalez. Although there was some overlap with the pre-warning questioning about Gonzalez,
10 the Court finds on a whole, the content post-Miranda questioning was sufficiently different to
11 break any attenuation. On balance, the Court finds the interrogation here did not employ the
12 two-step strategy addressed in Seibert and Williams.

13       Because a two-step interrogation technique was not employed, the admissibility of
14 postwarning statements is governed by the principles of Oregon v. Elstad, 470 U.S. 298 (1985).
15 Seibert, 542 U.S. at 620. In Elstad, the Supreme Court held "[t]hough Miranda requires that the
16 unwarned admission must be suppressed, the admissibility of any subsequent statement should
17 turn in these circumstances solely on whether it is knowingly and voluntarily made." Elstad, 470
18 U.S. at 309.

19       The Court finds Silva understood his rights and voluntarily waived them. Agent Escobar
20 read in Spanish each Miranda warning to Silva from his DEA issued 13A card. After each right,
21 Agent Escobar asked Silva if he understood the right. To each Silva answered "Yes." Silva also
22 stated he would waive these rights and answer Agent Escobar's questions. In testifying before
23 this Court, Silva expressed no confusion as to the rights he waived and acknowledged voluntarily

answering the government agent's questions. Because the agents did not deliberately employ the two-step strategy, and because Silva's post-<u>Miranda</u> statements were knowingly and voluntarily made, the Court denies defendant's motion.

Nonetheless, Silva attacks the voluntariness of his statements, arguing the government failed to advise him of his right, as a foreign national, under the Vienna Convention to contact the Mexican consulate. This argument lacks merit.

Under Article 36(1)(b) of the Vienna Convention on Consular Relations, "when a national of one country is detained by authorities in another, the authorities must notify the consular officers of the detainee's home country if the detainee so requests." <u>Sanchez-Llamas v. Oregon</u>, 548 U.S. 331, 338 (2006). Article 36(1)(b) also provides that authorities in the country of detention "shall inform the person concerned without delay of his rights" under the subsection. <u>Id.</u> However, even if authorities failed to notify Silva of his right to contact the Mexican consulate, the proper remedy is not to suppress the statements: the Vienna Convention does not confer judicially enforceable individual rights. <u>Sanchez-Llamas</u>, 548 U.S. at 349 (noting suppression of evidence "would be a vastly disproportionate remedy for an Article 36 violation.")

Here, the Court finds the government did not inform Silva of his right to contact the Mexican consulate. Following <u>Sanchez-Llamas</u>, the Court finds no grounds to suppress the statements made at the DEA office because federal law does not require suppression of statements or other evidence obtained as a result of the failure to alert a consulate or to inform a criminal defendant of his rights under Article 36.

Nor is the Court persuaded the government's failure to advise Silva of his right to contact the Mexican consulate implicates the voluntariness of his statements to investigators. As

discussed in the preceding paragraphs, Silva knowingly and voluntarily waived his <u>Miranda</u> rights.

The Court does find it disturbing that a supervisor with the DEA, Agent Escobar, would show complete ignorance of the Convention, the purpose for advisement of consular rights, and the DEA's policy regarding these rights as outlined in the DEA manual. This is a particularly sorry state of affairs given the DEA's frequent contact with foreign nationals.

Nothing in the record supports Defendant's position that if he had known about his right to contact the Mexican consulate, he would not have answered Agent Escobar's questions. Because federal law does not require suppression and the failure of government agents to advise Silva of his right to contact the Mexican consulate implicate the voluntariness of his statements, the Court DENIES the motion to suppress statements made at the DEA headquarters.

A. <u>Cell Phone</u>

Silva moves to suppress the cell phone, TT54, on the grounds the search was unlawful. The Court agrees finding the discovery and search of the phone exceeded the plain view exception to the warrant requirement.

"[A]n arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." <u>Payton v. New York</u>, 455 U.S. 573 (1980). The Supreme Court in <u>Maryland v. Buie</u>, 494 U.S. 325 (1990), held the Fourth Amendment permits law enforcement executing an arrest warrant to conduct "a quick and limited search of premise… to protect the safety of police officers and others." <u>Id</u>. at 327. Such a protective sweep is "narrowly confined to a cursory visual inspection of those places in which a person might be hiding" and may last "no longer than it takes to complete the arrest and depart the premises." <u>Id.</u> at 335-36. In the course of a

police sweep, officers can seize evidence "which was in plain view and which the officer had probable cause to believe was evidence of a crime." Id. at 1093.

The Court finds government agents exceeded the scope of their lawful entry into the home and the protective sweep. First, Agent Escobar arrested Silva within a minute of their entry into the home. Silva was handcuffed without incident. Yet, government agents remained in the home, failing to depart after the arrest was completed. Instead, without a search warrant and without advising Silva of his Miranda rights, Agent Escobar questioned Silva with the purpose of obtaining incriminating evidence. The Court cannot find a reasonable basis upon which the questions posed by Agent Escobar— the presence of guns, drugs, and money as well as the location of Silva's cell phone—related to his arrest. At oral argument the government contends the delay was justified in order to allow Silva to dress. Given the nature of Agent Escobar's questioning, directed at locating the cell phone, not the Defendant's clothing, the Court finds this argument disingenuous. Agent Escobar did not ask Silva where he kept his pants. Instead, in an apparent effort to skirt the lack of a search warrant, government agents remained in the home to obtain incriminating evidence. In doing so, government agents exceeded the scope of their lawful entry into the residence. The sweep for safety was quickly accomplished and there was no need to go to the bedroom except to locate the phone.

Second, the Court does not believe the discovery of the cell phone was the result of plain view. For the plain view doctrine to apply, "'two requirements must be met: the officers must be lawfully searching the area where the evidence is found and the incriminatory nature of the evidence must be immediately apparent.'" United States v. Stafford, 416 F.3d 1068, 1076 (9th Cir. 2005) (citation omitted). As discussed in the preceding paragraph, although government agents had authority to enter the Silva home for the purpose of arresting him and to conduct a

sweep for their own protection, the scope of that authority was exceeded when after arresting Silva, they remained to conduct a fishing expedition in an effort to locate the cell phone. Assuming <u>arguendo</u> law enforcement had a lawful basis to remain the house, the government has failed to meet the second part of the plain view test: that the incriminating nature of the cell phone was immediately apparent. When Agent Escobar took Silva to the bedroom he shared with Ms. Prudente, there were two phones on the ironing board. Agents did not seize both. Instead, to know if the cell phone was TT54 and therefore incriminating, they required Silva to identify which phone belonged to him. The government failed to offer evidence that without this identification by Silva it would have nonetheless seized the telephone. Because the government failed to establish the phone met the "plain view" exception to the Fourth Amendment requirement that officers obtain a search warrant, the Court suppresses the cell phone.

Even if the phone had been lawfully taken, the Court finds the information gleaned from opening the phone to read off numbers of recent contacts and numbers in the address book has problems. No warrant was sought or obtained for TT54. The officers would be advised to secure a warrant before taking their own forensic examination of the phone. See e.g., <u>United States v. Park</u>, 2007 WL 1521573 at *8-9 (N.D.Cal. May 23, 2007).

In an apparent attempt to salvage the unconstitutionality of the seizure of the phone, the government argues Ms. Prudente consented to a search of the house and the discovery of the phone was therefore inevitable. (Dkt. No. 720.) The government fails to carry its burden of showing Ms. Prudente's signature of the consent to search form resulted from her informed and voluntary waiver of her rights to be free of an unreasonable search.

The Fourth Amendment's protection against unreasonable searches and seizure may be waived if a person consents. <u>Katz v. United States</u>, 389 U.S. 347, 358 n.22 (1967). Nonetheless,

it is the government's burden to show consent was given "freely and voluntarily." <u>United States v. Chan-Jimenez</u>, 125 F.3d 1324, 1327 (9th Cir. 1997). The Ninth Circuit has identified five factors to be considered in determining the voluntariness of consent to a search: (1) whether defendant was in custody; (2) whether the arresting officers had their guns drawn; (3) whether <u>Miranda</u> warnings had been given; (4) whether the defendant was told he has a right not to consent; and (5) whether defendant was told a search warrant could be obtained. <u>United States v. Morning</u>, 64 F.3d 531, 533 (9th Cir. 1995) (quoting <u>United States v. Castillo</u>, 866 F.2d 1071, 1082 (9th Cir. 1988)). The fact that some of these factors are not established does not automatically mean consent was not voluntary. <u>Id.</u>

Applying these factors, the Court concludes Ms. Prudente did not voluntarily consent to a search of the house. Ms. Prudente and her young children were detained in a small bedroom of her home. Several law enforcement officers were also in the room. Prior to being detained there Ms. Prudente had witnessed agents perform a sweep of the house with their guns drawn. In deciding whether Ms. Prudente voluntarily consented to a search of her home, the Court finds especially significant the government's failure to advise Ms. Prudente of her right to refuse. Government agents had learned Ms. Prudente only spoke Spanish and was illiterate in both English and Spanish. Yet, despite the presence of a California state certified translator, Detective Rodriguez, the government failed to show anyone, including officer Rodriguez, ever advised Ms. Prudente that she could refuse consent. Based on these facts, the Court finds Ms. Prudente's consent to search the residence was not freely given.

**Conclusion**

The Court GRANTS in part and DENIES in part Defendant's motions to suppress. Because he had not been advised of his rights under <u>Miranda,</u> Silva's statements at the residence

were not a voluntary, knowing, and intelligent waiver of these rights. Therefore, the Court suppresses these statements. The Court also suppresses the cell phone discovered at the residence, as it was the product of an illegal search. The Court DENIES the motion as to Silva's statements at the station after he received <u>Miranda</u> warnings. The clerk is ordered to provide copies of this order to all counsel.

Dated this 25th day of January, 2013.

_____
Marsha J. Pechman
Chief United States District Judge

FINDINGS OF FACT AND CONCLUSIONS OF
LAW AND ORDER GRANTING IN PART
DEFENDANT'S MOTION FOR SUPPRESSION
OF EVIDENCE AND STATEMENTS- 17